The next matter called is agenda number 8, case number 122484, Papal v. Bonilla. Ellen, are you ready? You may proceed. Good morning. May it please the court. I am Assistant Attorney General L.W. Malinow on behalf of the people. This court should reverse and find that the circuit court erred in granting defendants' motion to suppress evidence for two independently sufficient reasons. First, there was no Fourth Amendment search under the property test set forth in Florida v. Jardines. In this case, an officer walked through the unlocked exterior door of an apartment building with a trained K-9 dog. The K-9 alerted in a common area hallway outside the defendant's apartment. The lower courts believed that this common area qualified as curtilage, but it didn't. A, defendant had no possessory interest in the property, so it couldn't be his curtilage. It couldn't be a search of his property. And second, even if he had a possessory interest in it, the area was not so intimately connected physically and psychologically to his apartment that it would qualify as his unit's curtilage. There's a second basis for reversal, which is that the officers acted in good faith reliance on binding appellate precedent. They relied on two lines of cases. One, holding that there was no reasonable expectation of privacy in the common area behind the unlocked outer door, and two, that the dog sniff did not separately implicate legitimate Fourth Amendment concerns. So turning to the first basis for reversal, whether or not there was a search, two tests are employed to determine whether there was a search under the Fourth Amendment. One, the property-based approach, and two, the reasonable expectations of privacy analysis that was the dominant analysis for close to half a century. Under the property-based approach, a search occurs when state actors engage in an unlicensed physical intrusion upon one of the enumerated protected properties, in this case the house or the home, which includes the curtilage. But the area here cannot be curtilage because defendants had no possessory interest in it. We know the importance of the possessory interest, the property, for several reasons. One, of course, it's in the name, the property approach. Two, the way it was announced in Jardines that there was an intrusion onto an area belonging to defendants. We know it's important because of the alternative, the alternate way it's described as a trespass, that it must be a trespass upon the property of defendants. Here it could not have been a trespass upon defendants' property. We also have, can use a couple of hypotheticals to describe an irregular shaped lot in which the house has to be built in such a way that the front door abuts a public sidewalk. An officer walked down the public sidewalk with a canine dog, and the dog, standing on the sidewalk, conducted a sniff of the unit, of the house. We would never say that officer was standing on the home's curtilage. He was on a public sidewalk. The same goes if the officer went into the neighbor's house. Let's say from the neighbor's property, could access a side door or was very close to a side door of the suspect's house. The officer asked the neighbor, can I go onto your property with my canine? The neighbor said, sure. From the neighbor's property, the officer conducted the sniff and alerts. We would never say, well, that neighbor's property was the curtilage of the defendant's home. It was the neighbor's house. So it couldn't be that the officer was standing on the curtilage. We're going to find some sort of search. We must do it some other way. We couldn't find that the property, the neighbor's property or the public sidewalk was the curtilage. This doesn't mean that multi-unit dwellings can never have a curtilage. Multi-unit dwellings might have areas that are akin to a porch. Either through the lease or practice, there might be a patio area or a porch, which there would be exclusive control over that area. And that could be a property interest and the defendant's curtilage. Not so when it's a common area here. The common area, even if the defendant had a possessory interest in it, would not have qualified as curtilage under the four-factor Dunn test. So these are four factors which the court uses, which the Supreme Court set forth in Dunn. They're not to be applied mechanically or rigidly, but they're intended to inform us of the central issue, whether the area harbored the intimate and private activities of life such that we would extend the umbrella of fourth member protection to a home to that area that we consider a part of the area itself. Mr. Malmuth, with regard to that issue, if the dog sniffed at someone else's door, would there have been, other than where the police received the tip, would the police have cause to search those units as well? Yes, Your Honor. The issue is, I'm undertaking a hypothetical. The officer brings the canine to the unit with the idea of sniffing one particular unit. But then upon there, the dog sniffs, alerts at that door and another door as well. Well, the question there is then, is probable cause, is a dog, a canine sniff sufficient to establish probable cause? The dog sniffed from that other door, that other unit. There was no other tip for that other unit, however. Yes, Your Honor. As long as we believe, which this court, the United States Supreme Court has said is true, and for instance in the court of the Harris, the United States Supreme Court said these dogs are a very reliable basis of information to believe that there's a privacy absence or presence of contraband. But that would give a license to officers to go through buildings, halls, go up and down the hall then, if there was no privacy expectations. Well, Your Honor, that's true. If an officer is walking down a public sidewalk. But this is not public. Let's stick with this. This is a building that people live in, and there was a tip for a particular unit. And other people live in that building, and the dog sniffed at another unit. Those people wouldn't have any privacy? Well, there are two issues there, Your Honor. First, it's certainly right that the officers wouldn't be walking on the curtilage of any of those units. If it's a common area, it does not turn, the officer is not, unless there's some other fact that we don't know of, a common area hallway behind an unlocked door is not the curtilage of any of those units. So any condominium building with hallways available off an elevator, at least for walking down, and nobody would have an expectation of privacy? Well, Your Honor, again, there's the reasonable expectation of privacy analysis. That's separate from this property approach. So a property approach is not the sole way of determining whether a search occurred. There's also the reasonable expectation of privacy analysis. Under the property approach, it must be that the officer was on one of the enumerated protected areas, the Fourth Amendment, in this case the home. So it must be the home or its curtilage. That's right. And that makes this case very different than Burns, for instance, which was behind a locked exterior door. Here, the area was behind an unlocked door. So in Burns, we can see that the, perhaps shows the outermost limits of what could be considered sufficient possessory interest. Because at least there, it showed that the tenant's inside. At least the general public was excluded. Here, that's not even the case. And thus, it can't have been, the area couldn't have been in the possession, in exclusive control of the defendant. And the lack of the unlocked door also is critical in assessing the done factors. So there we have the four factors, including proximity. And in that case, that weakly would suggest curtilage, because it's close to the home, although it's a weak connection because it's also close, as you already know, to the front doors of other apartments in that common area. But the other three factors weigh heavily against a finding of curtilage. Those include the nature to which the area is put. Now, the defendant says that he used this area just for exiting and entering his apartment. Well, of course, those aren't private, intimate activities. That's an activity that only goes to him actually to entering his home, where he would then engage in the practices of life. And there's also no reason to think that the hallway was so limited. Defendant, other tenants could have used it, the landlord, and of course, again, the general public. We also have whether there was an enclosure, whether the area was within an enclosure surrounding the home. And here, it's not within one that's exclusive to the public. Defendant suggests that because it's within the four walls of the building, that's the relevant enclosure. But that can't be right. That would include a restaurant or retail store on the ground floor of a multi-unit dwelling. It would include a parking garage, all sorts of areas that can't be the curtilage, and certainly don't show that intimate private activities took place there. And the final criteria is whether steps were taken by the resident to protect the area from observation by people passing by. Again, here, no such protection occurred. Any of the tenants, of course, could have observed it. And any member of the public who walked through the building, which was, again, open to the public, could have observed it. So it was not protected in any way. So this area was not curtilaged because there was no possessive interest in it, and also because it didn't satisfy the benefactors. And for that reason, there's no search under the property approach. And this approach should reverse on that basis alone. But a second reason for reversal exists, and that is that the officers can rely, in good faith, on two lines of precedent. Now, the Fourth Amendment says nothing about excluding evidence. The exclusionary rule is a judicial remedy designed to deter culpable police conduct. It's a last resort used only when police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights. And here, there are two lines of precedent which, taken together, authorize the activity. First is the decision in this case, in this court's case, People v. Smith, in the Appellate Court case of Carradine, which stated that there's no reasonable expectation of privacy in a common area behind an unlocked outer door. So in Smith, very much like here, officers walked through an unlocked exterior door into a common area hallway and overheard the defendant there confessing to murder. And this court said there was no search. There was no reasonable expectation of privacy because the officers simply walked through an unlocked door into a common area. Now, the objection is that, well, in Smith, they didn't use any artificial means to enhance their abilities. And this brings up the second line of cases, which are the line of cases of this court and the United States Supreme Court over the last several decades, indicating that a canine sniff does not implicate legitimate Fourth Amendment concerns. That is because of the limited nature of the intrusion, simply the dog was sniffing the air, and the very limited nature of the information it collects, simply the absence or presence of the contraband. Because of those two factors, the canine sniff is not considered a search under Fourth Amendment. And the objection is, well, it didn't happen in those cases. It didn't happen in a home. And that's, again, when we go back to the first line of precedence, where this area has been determined by this court previously to not be the home because there are reasonable expectations of privacy. Now, when this court said there weren't any expectations of privacy in an unlocked common area, again, very different from Burns in which there were. It was behind a locked common area. So if there are no further questions. So you also, in your arguments in your brief, also rely in this good faith argument on the Seventh Circuit case of the United States versus Brock. Is that right? That's correct, Your Honor. Brock and other Seventh Circuit cases that were achieved before the search. And that was in 2005, right? I believe that's right, Your Honor. Well, isn't it true in 2014, this event took place in 2015, right? Right, March 2015. Isn't it true in 2014 that the Seventh Circuit overruled the Brock case that you rely on in U.S. versus Gutierrez, saying Brock is no longer good law? Jared Dean's expressly held that a drug dog sniff on the curtilage is a Fourth Amendment search for which a warrant is typically required. Your Honor, I believe Gutierrez, and I apologize, my recollection of that case is a little hazy, but involved somewhat different circumstances than Brock. And wasn't, in a rule, the relevant part of Brock that we would bring in here. But in any event. The issue, of course, is good faith. Police officers being able to know what is allowed and what's not. And perhaps we're suggesting that, you know, you in your brief and in your closing, your reply brief, go back to this case saying that police officers could have relied on the Seventh Circuit case. And now we both kind of agree, at least to some degree, I'd suggest very strongly, the Seventh Circuit before this event overruled that case. In other words, one way or another, you look at it, the law is pretty murky when this event took place. Well, Your Honor, again, the Seventh Circuit cases go to, are one way in which the officers might show good faith. So they can show good faith through binding precedent of the state courts. They can show good faith through binding precedent of the Seventh Circuit. And they can show good faith through the legal landscape. And we submitted that there were several ways, each of which could qualify as showing good faith. Now, certainly the officers could rely in good faith on cases of this court, cases of the appellate court, and cases of the United States Supreme Court. And that's, there's no question that those cases have not been, were not in effect or have been overturned somehow before the search in 2015. Again, my apologies for my lack of ability to remember why the Gutierrez case was not, the details of that case specifically. But in any event, they certainly didn't need that case. That would have just added to the multiple other reasons in which the court, in which the officers would have had good faith. So there's no doubt, again, that the officers could have had good faith by, through the cases of this court and the appellate court and the United States Supreme Court, none of which has there been any indication were in any way diminished or extinguished. So if there are no further questions, we would ask this court to reverse the judgment of the appellate court. Thank you. Appellee. May it please the court, counsel. I'm Hector Leroux. Along with my learned colleague, Catherine Stroll, we represent Derek Bonilla. And with respect to my learned opponent, the issue properly stated in this case is whether the threshold of Mr. Bonilla's home is protected by the Fourth Amendment. And that formulation of the issue arises from the facts. Detective Bripner's affidavit that I quoted in the motion to suppress in the trial court says that Officer Genicio's narcotics-trained canine, Luna, and here's the quote, came to the doorway of apartment 304 and moved back and forth in the doorway, sniffing the bottom of the door and stopped. The canine then went into her final response, indicating a positive alert for the presence of illegal narcotics. The state's characterization of the issue, whether this entire building is curtailed, is not what was argued on in the trial court, not what the trial judge ruled on, not what was argued in the appellate court, and not what the appellate court ruled on. At each stop along the way, we have argued and the lower courts have agreed that Officer Genicio's use of his narcotics-trained canine at the threshold of Mr. Bonilla's home is what violated his Fourth Amendment rights. The issue has already been decided in Mr. Bonilla's favor, most notably by this court in Burns and by the United States Supreme Court in Jardines. And, using a different analysis, the Seventh Circuit in Whitaker. Those decisions all applied the Fourth Amendment to the thresholds of homes and found those thresholds protected from warrantless searches, warrantless intrusion by canine forensic investigation, in one court's phrase. In other words, bringing a super-sensitive instrument to the home to detect things that they could not perceive, the officers could not perceive, without that assistance. The rationales for those decisions, counsel is correct, rest on either the property-based protection jurisprudence that's arisen under the Fourth Amendment, under the reasonable expectation of privacy jurisprudence that's arisen under the Fourth Amendment, or both. They're overlapping concepts. And the Supreme Court has made very clear that the reasonable expectations of privacy jurisprudence has been added upon the property rights jurisprudence, not used to supplant it or otherwise diminish it. The property-based analysis follows the constitutional principle that police searches of homes have to comport with the Fourth Amendment because the Fourth Amendment makes every home the first among constitutional equals. It's a sanctum sanctorum, the holy of holies in constitutional jurisprudence. The threshold of Derrick's home enjoys that first among equals status. This court's decision in Burns found a landing outside of an apartment home, outside of two apartment doorways, to be within the curtilage of the residence. And this court, writing through Justice Kilbride, took two parallel roads to that conclusion. The first is the consideration of the done factors that counsel briefly discussed and that we would submit to the court, each of which strongly supports the conclusion that Mr. Bonilla's threshold is within the curtilage. And in determining that the landing on the third floor of the Burns apartment building was akin to the porch in Jardines, and therefore, curtilage. Is the entire hallway curtilage or just the threshold? The threshold's the only issue in front of the court, Your Honor. And incontestably, the threshold is where the search occurred and where Mr. Bonilla's rights attach. And so considering the threshold and the done factors, problem one is, is it proximate to the property? Well, it's the exterior border of the property. You can't get more approximate. And if the door opens into the dwelling, as most entry doors do, it's inside the house. That you can't get more approximate than actually inside. So the second one is, is it within an enclosure surrounding the home? Counsel talks about parking garages and restaurants and things, and I'm not sure I understand what that's about. But the reality of this situation is there's an apartment building with an entryway, stairs and things, and walls surround Mr. Bonilla's threshold. You can't get more enclosed than being within walls. Would somebody be trespassing, counsel, where the dog sniffed? I'm sorry? If someone was standing where the dog sniffed, would somebody be trespassing? That goes to the lengthy discussion in the Jardines case about the applied license that's granted to people to approach residential doorways. And counsel argues that the general public is welcome to come to Mr. Bonilla's threshold. That's not what the Supreme Court held in Jardines, where they said there's an implied license if you have something to do at somebody's residence to approach the residence, knock, do your business, and then promptly leave. Would you agree that, obviously, you know who's asking the question, someone who authored a lengthy dissent in Burns and thought even when the common areas were locked, I didn't think there was curtilage involved. But if the majority of this court, in writing some opinion, would rather than call it a threshold, call it a common area, would you agree that the Burns case primarily and pretty explicitly dealt with the fact that the doors could be locked to that common area? Well, you're asking a couple of questions, Your Honor. Take your time. I think my initial response to your question, Justice, is that the threshold is so proximate to the House that depriving it of curtilage or home status under the Fourth Amendment would be error. If the question is the broader question of is the common area somehow curtilage, we're drawing different lines. And those lines, I don't think, are before the court in this situation. I suggest that on the basis of Supreme Court precedent. They met at the federal Supreme Court. Paton versus New York. U.S. versus Santana. Both of them cited in the appellate court's decision in Burns, and that will become relevant later on. And both of them standing for the proposition, as does Kilo and much others in court precedent, that there is a firm line drawn at the threshold of the home. It's a firm enough line that neon lights would probably be justified as being, this is where the Fourth Amendment illumination really kicks in. So that's a wandering answer to your question, but I think your overall question is, does a locked exterior door have any bearing on the status of the threshold? And the short answer to that is no, it doesn't. So with your permission, Your Honor. Let me ask it this way then. To prevail in a situation such as this, unlike Burns, where the doors are locked, would this court have to agree that threshold is not a common area? I don't think a threshold. If it is a common area, it is so intimately linked with the specific home involved that it is explicitly privileged to that home. I would add, Your Honor, that the exterior lock in Burns is not relevant for another reason. And that is that there's silence in the Burns record as to how the police actually defeated that lock. We don't know if they picked it or if they were invited by somebody with an interest in the property who consented to their entrance. And we don't know if they just stood outside lurking, waiting for somebody to come out so that they could stick their foot in the door before it closed back up. So without knowing more about the operation of the locked door in Burns, I would suggest to you that it ought not have a bearing on the disposition of the participants. So I think I was in the middle of the done factors when we started talking, so if I can pick up back there. And this is actually responsive. It has to do with the nature of the activities that are conducted at the threshold of the residence and whether those are related to the intimate functions of the residence. Justice Scalia, writing for the majority in Jardines, talked about the undisputed right of people to retreat into their homes. Well, the threshold is the means of ingress to effect that retreat. That is definitionally an intimate activity of the home. The threshold is also where you greet guests and take their coats and tell them to wipe off their muddy shoes and welcome them into your home. That's an intimate activity of the home. It's where the Girl Scouts come and knock on the door and, oh, it's so-and-so's daughter, and they destroy her diet. Another intimate activity of the home. The threshold certainly satisfies that third prong of the done things. The fourth prong is it's shielded from observation by passersby. Now, I didn't understand the opposing counsel's comments on this point. He seemed to suggest that other tenants constituted passersby. That's not what the case law that I've read stands for. The offered hypothetical in the federal Supreme Court decisions is always, can somebody walking by on the sidewalk see wherever it is that's protected? Is it behind a privacy fence or a hedge or something? Well, this is behind actual walls. And is it protected from view? Yeah, it's on the third floor. The record's conclusive about that. We stipulated those facts in the trial court. Can passersby on the public way see what's going on at Mr. Bonilla's threshold? No way. So given those four propositions under the done case, this is incontestably part of the curtilage, and therefore part of the home, part of the first of our new rules. The threshold is not an arbitrary line to draw here. The right to retreat, again, Justice Scalia, and I just want to read this because it talks about the practical effect of drawing the line at the threshold. Justice Scalia wrote that the right to retreat into the home would be of little practical value if the state's agents could stand in a home's porch or side garden and trawl for evidence of impunity. The right to retreat would be significantly diminished if the police could enter a man's property to observe his repose from just outside the front window. So the threshold is necessarily honored in that practical concept of the right to retreat within the home. As you were describing the elements, the gun elements, and saying that threshold is surrounded by wall and within the home, no part of the threshold extends outside the door, is that your position? Okay, I think I have an answer for that, Your Honor. When one of my colleagues left the Rock Island County Public Defender's Office, he gave each of us a going away gift. He's moving to Colorado to be with his wife. And he gave me a gift, and it was a doormat. And the doormat is the thing that you put at the threshold to your residence. I mean, everybody's gone to a house, and there's something that says hello or welcome or something. Mine was a particularly wonderful gift coming from one assistant public defender to another because it said, come back with a warrant. So I would suggest to the Court that the threshold likely extends at least to the dimensions of a doormat. A doormat? Yeah. A foot, 18 inches, 50 inches. Sure. So with respect to the privacy, the expectation of privacy analysis that's developed under Fourth Amendment jurisprudence, those principles were established in CATS initially, the phone booth and the phone call and the wire tap and so on. And Kylo with the infrared sensing device that allows people to see the heat signatures of movements coming out of the apartment. And Kylo specifically talked about observing things using sense-enhancing devices, right? And there's no question that a narcotics-trained canine is a sense-enhancing device. The Seventh Circuit Court of Appeals in the Whitaker case noted, and here's a great quote, a trained drug-sniffing dog is a sophisticated sensing device not available to the general public. The dog here detected something, the presence of drugs, that otherwise would have been unknowable without entering the apartment. That's the same as the infrared device in Kylo. Another example that the federal Supreme Court gave us is holding a stethoscope to the door to hear things that the unaided senses can't hear without entering the apartment. Targeting Luna at Mr. Bonilla's door is using a sophisticated sensing device to detect something that would otherwise be unknowable without entering the apartment. So, without a warrant, that search runs afoul of Fourth Amendment protections under the privacy analysis. And I'm going to cut the privacy thing short because I've only got a couple minutes left and I need to talk to you about the good faith assumption. There were two cases addressing very, very similar facts that had been decided and were on the books as of the date of this search. In January of 15, the Fourth District Appellate Court's decision in Burns considered a canine sniff at the threshold of a residence and said, no, police, you can't do that. Jardines, considering a canine sniff at the threshold of a residence, said, no, police, you cannot do that. Those two cases, the highest court in the land and the highest appellate court in Illinois to issue a decision at the time, not only flipped the Davis standard on its head, I mean, far from affirmatively authorizing a canine sniff at somebody's threshold, these cases both forbade it. So, with those precedents, which are factually very, very similar, and from binding authorities, the good faith assumption simply cannot operate in this case to absolve the police from Luna's sense-enhanced sniff at the threshold of Mr. Bonilla's home. So, unless there are any further questions, Your Honors, I would respectfully request that you confirm the appellate court and thank you very much for your time and attention. Thank you. Rebuttal. Good afternoon again, Your Honors. I'm going to try to make a few quick points on rebuttal. First, with respect to this argument that the canine sniff is the same as the thermal imaging equipment used in pilot, it's an interesting argument. It's an argument that's been raised, and in fact, it's an argument that's been rejected by no less authority than the United States Supreme Court. So, in Cabalas, that was the argument raised that the dog sniff outside of the car was the same as using a thermal imaging device, and it wasn't raised in the dissent, but the majority said that's not so, and we've held in all these cases that a canine sniff is different. So it's an interesting argument, but one that's been rejected. With respect to the argument that the Burns case, the appellate court, that the Burns appellate court case meant that the officers here couldn't act in good faith. Again, this case is distinguishable from Burns based on the fact of the locked exterior door. That was the crucial difference in Burns, and the fundamental fact that this court relied on. The fact that there was a case at that time which suggested that an area behind a locked exterior door was privileged, or in some ways, there could be a search just by going onto that property, in no way diminished the ability for the officers to rely in good faith on holdings by this court, that there were no reasonable expectations of privacy in the areas behind an unlocked common door. So certainly the appellate court could not overrule this court, and there was also, of course, the distinct fact, the distinguishing fact, of the locked versus the unlocked outer door. Can I ask you just generally about the good faith exception? How precise does the police officer on the street have to read appellate court cases and Supreme Court cases? Is this a question of principles the officer can rely on, or for an officer to be able to rely on a case, do the facts have to line up exactly the same? No, Your Honor, the facts don't have to line up exactly, and, of course, that would be completely unworkable. The facts line up exactly in almost no cases, in almost no two different cases. So it's never the case, or almost never the case, where the facts line up exactly as to an appellate court case. And as Your Honor mentioned, we wouldn't expect an officer to know what a court held. We wouldn't expect an officer to be familiar with every appellate court's decision that comes out in terms of the very fine-grained nuance of those decisions. So in this case, there were two principles, and those basic principles, that there was no expectation of privacy in an area behind an unlocked door, and that a canine snap did not implicate legitimate Fourth Amendment concerns. And these are broad principles that the officers could have relied on a good way to be where they were in an area that this court had said there was no expectation of privacy, engaging in conduct that this court, and the United States Supreme Court, had said implicated no privacy concerns. And at the very least, those principles would be enough. If you look at a case like Kerrigan, in that case, the appellate court, the officer walked into a stairwell. That was a common area. From this common area, reach in to a dryer vent that was within the defendant's apartment. And the appellate court there said there was no violation of expectations of privacy because the officer was in a common area behind an unlocked outer door, and simply reaching an area accessible from there. Well, an officer reading this should certainly believe that less intrusive activities staying within the common area and conducting the canine snap would not be an invasion of the Fourth Amendment rights. If there's a case that's more invasive. Now, briefly, I want to address a couple points that come from a source of the fact there's such a lack of record here. So defendants proceeded, didn't call witnesses at a suppression hearing, proceeded just on the basis of the warrants. And so we know very little about the case. And defendants proceeded this way because he believed, in a bright-line rule, that any common area behind, in a multi-unit dwelling, is curtilage, and that any dog sniff there is a violation. That was the theory that defendants proceeded on. So defendants are absolutely right that we don't know anything about the area. We don't know that there was a doormat. We don't know if there's any other basis to believe that any part of this was excluded from view. We don't know anything, because defendants proceeded on the basis that we didn't need to know those things. And so we have no facts which suggest, and those facts could be established at a suppression hearing, facts which would indicate there was some expectation of privacy if they wanted to proceed along that route to show that there was a Fourth Amendment search through that analysis. There's nothing in the record that would indicate anything except for the fact that it's in an apartment building. We don't know anything about kinds of buildings. Would your position be different if there were facts that established it was within 18 inches of the door? Your Honor, no. If the argument is that that's all, that that's the only additional fact, that the dog was sniffing within 18 inches of the door, certainly not. That's certainly still not the curtilage of the defendant's apartment. And that alone wouldn't indicate that there's, based on the current... So your position is what opposing counsel calls threshold, you still call common area. Well, Your Honor, the threshold is this, I'm not exactly sure, I guess an undefined area of space outside of the doorway. I mean, that is the common area. There's no indication that there was any area, for instance, marked out by a doormat, in which case maybe you would think that other tenants wouldn't walk over that doormat. Maybe that could be a relevant fact. I wouldn't stand here today and say that that alone would be enough. And again, to demonstrate that it's curtilage, that it's exclusive control, but that might be a factor. That fact isn't present. That just goes to show the dearth of facts here. Defendant's position is we don't need any facts. We don't need to know if there was a doormat covering the front 18 square inches or whatever it might be. Because the whole area is essentially curtilage. And no matter what was, whether exclusive any form of control was exercised, it's curtilage. It doesn't matter in defendant's view, as long as the officers are in the common area. Now quickly, turning towards the, and this lack of record applies also, moves also then to the done factor. So for instance, defendant says that the area is protected from the view of passersby because it's from the four walls. Well again, that applies to every area that's within the four walls of a building. It applies to a janitor's closet, to which the defendant doesn't have a key. That doesn't mean that in any way defendant has protected that area. It's within some enclosure of defendant's area for which the passersby won't see. And in this case again, all we know is that there was an unlocked outer door. The attorney for the state even said that there was no signage declaring that anyone else wasn't allowed to, that only tenants were allowed on the property. There's really nothing. And that's the defendant's position. We don't need any facts. We don't need any signs, any laws, anything, because every common area qualifies as curtilage under JV. So unless there are any further questions, I'll leave it at this point. Thank you. Thank you. Case number 122484, People v. Medea, will be taken under advisement as number eight.